## HITCHCOCK, Secretary of the Interior, *v.* THE UNITED STATES EX REL. BIGBOY.*

MANDAMUS; INDIANS.

1. In a proceeding by mandamus against the Secretary of the Interior and the Commissioner of Indian Affairs to determine whether in a given case the United States has the right to restrict the use by an Indian of the proceeds of the sale by him of timber on land assigned to him in severalty, but with restrictions on his power to alienate it, the question whether he is a citizen with the rights and privileges of a citizen is immaterial; his rights as a citizen not necessarily being impaired because, as grantee of the land given him by the United States, his power to alienate the land, or its proceeds, is restricted and limited.

2. Mandamus will not lie to compel the Secretary of the Interior and the Commissioner of Indian Affairs to direct an Indian agent, a subordinate official, to perform a mere ministerial duty, such as countersigning a check. If the duty be a mere ministerial one, no order of the Secretary or Commissioner could be a justification for refusal on the part of the subordinate to perform it.

3. Where an Indian to whom land in severalty has been assigned by the United States with certain restrictions on his power of alienation made a contract to sell, and sold, timber thereon under regulations promulgated by order of the President prior to his grant, which regulations provided that the proceeds of the sale of such timber should be deposited in bank subject to the check of the Indian owner and countersigned by the local Indian agent, sought by mandamus to compel the

*Mandamus.*—As to remedy by mandamus in general, see the presentation of the authorities in the following editorial notes: To compel acceptance of office, note to *People ex rel. German Ins. Co.* v. *Williams*, 24 L. R. A. 492; to compel surrender of office, note to *Stevens* v. *Carter*, 31 L. R. A. 342; to compel action of medical board, note to *Iowa Electric Medical College Asso.* v. *Schrader*, 20 L. R. A. 355; to compel payment of municipal debt by custodian of municipal fund, note to *Ray* v. *Wilson*, 14 L. R. A. 773; to enforce right of lowest bidder on public contract, note to *Anderson* v. *Public Schools*, 26 L. R. A. 711; to enforce provision of by-laws of corporation, note to *Bassett* v. *Atwater*, 32 L. R. A. 575; to compel operation of railroad, note to *State ex rel. Little* v. *Dodge City, M. & T. R. Co.* 24 L. R. A. 564; unconstitutionality of statute as defense against mandamus to compel its enforcement, note to *State ex rel. New Orleans Canal & Bkg. Co.* v. *Heard*, 47 L. R. A. 512; original jurisdiction of court of last resort in mandamus case, note to *People ex rel. Kocourek* v. *Chicago*, 58 L. R. A. 833; mandamus in exercise of superintending control over inferior courts, note to *State ex rel. Fourth Nat. Bank* v. *Johnson*, 51 L. R. A. 33.

276      HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.

Statement of the Case.                    [22 App.

Secretary of the Interior and the Commissioner of Indian Affairs to cause money so realized and deposited to be paid to him, and the petitioner claimed that the purpose of requiring his check to be so counter-, signed was merely to identify him at the bank, while the respondents claimed that it was to place a check upon the improvidence of the Indian,—it was *held* that the mere fact that there was serious controversy as to the meaning of the regulation took the act sought to be performed out of the category of plain ministerial acts subject to be enforced by mandamus; and a decree ordering the writ to issue was *reversed.*

4. The courts will hesitate before requiring the executive heads of the departments of the government to abandon their construction of departmental regulations and their administrative action thereunder.

No. 1294.   Submitted May 7, 1903.   Decided June 25, 1903.

HEARING on an appeal by the respondents, the Secretary of the Interior and the Commissioner of Indian Affairs, from an order of the Supreme Court of the District of Columbia directing the writ of mandamus to issue to the respondents. *Reversed.*

The COURT in the opinion stated the case as follows:

This is an appeal from an order of the supreme court of the District of Columbia, whereby the writ of mandamus was directed to be issued to the Secretary of the Interior and the Commissioner of Indian Affairs to require them to cause certain moneys to be paid to the relator, John B. Bigboy, one of the Indians of the Bad River or La Pointe Reservation, in the State of Wisconsin.

By a treaty entered into on September 30, 1854, between the United States and the Chippewa Indians of Lake Superior and the Mississippi, of whom the Bad River Indians were a part, the President of the United States was authorized, in his discretion, to assign to each head of a family among these Indians, and to any single person among them over the age of twenty-one years, a tract of 80 acres of land in the reservation, for the separate use of such Indian; and likewise, in his discretion, to issue patents for such tracts of land so assigned as speedily as the occupants became capable of transacting their own affairs, with

such restrictions upon the power of alienation as he might see fit
to impose. The relator, John B. Bigboy, is a Chippewa Indian
of the Bad River band, who, in pursuance of said treaty, had a
tract of 80 acres assigned to him in severalty and on April 24,
1894, received a patent therefor by direction of the President.
The patent contained this restriction of the power of alienation:
—"Said John Baptiste Bigboy and his heirs shall not sell, lease,
or in any manner alienate said tract of land without the consent
of the President of the United States."

On December 6, 1893, previously to the issue of the patent
to the relator, the President had caused certain regulations to
be promulgated, whereby these Bad River Indians were permit-
ted to sell certain stumpage timber from their lands, allotted
and unallotted, to one Justus S. Stearns, by contracts of sale to
be approved in each case by the Commissioner of Indian Af-
fairs. Among these regulations was the following:—

"After deducting one half of the cost of the scaling and other
necessary expenses chargeable against the same, the proceeds of
the timber sold from the unallotted portions of the reservation
shall be paid to the Indian agent to be expended for the relief
and benefit of the Indians of the reservation under the direction
of the Commissioner of Indian Affairs; and the proceeds of tim-
ber taken from the allotted lands on the reservation shall, after
deductions above stated, be deposited in some national bank,
subject to the check of the Indian owner of the allotment, coun-
tersigned by the Indian agent for the La Pointe Agency, unless
otherwise stipulated in the contracts with the particular In-
dians."

The relator, Bigboy, among other Indians of the reservation,
entered into contract with Stearns for the sale of the timber on
his allotted land, subject to the conditions of the said regula-
tions, and his contract seems to have been approved by the Com-
missioner of Indian Affairs. Stearns cut the timber and paid
the money to the Indian agent; and the latter, after making the
deductions specified in the regulations, deposited the net pro-
ceeds of sale, amounting to $1,144.05, in the Ashland National
Bank, in the town of Ashland, in the State of Wisconsin. Out

278    HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.

Statement of the Case.                [22 App.

of it the agent has from time to time paid small sums to the relator, but has declined, under instructions from the Commissioner of Indian Affairs and the Secretary of the Interior, to pay him the residue of it, although he has demanded it. On account of this refusal by the agent and the instructions upon which he justifies it, the relator has caused the present proceedings to be instituted by the filing of a petition for the writ of mandamus to require the Secretary of the Interior and the Commissioner of Indian Affairs "to pay over, or cause to be paid over, to the petitioner or his attorneys of record, the moneys standing to the credit of John B. Bigboy, and to make and promulgate all orders and directions necessary therefor."

In his petition he sets forth the facts substantially here stated, and claims that he has become a citizen of the United States by virtue of the act of Congress of February 8, 1887 (24 Stat. at L. 388, chap. 119), which confers citizenship upon all Indians to whom lands have been allotted in severalty; and that, by virtue of such citizenship, he has become entitled to manage his own property in his own way, and is no longer under governmental tutelage. The respondents, while admitting that the relator had become a citizen of the United States by virtue of the act of Congress of 1887, yet contend that to a certain extent he remains under tutelage; and that, as to the land allotted to him and the proceeds of sale of the timber cut therefrom, the government of the United States, through its proper officers, has the right and the duty of supervision and control; that it is under obligation to prevent improvident or unwise alienation of either; that the amount, time, and manner of payment to Bigboy of the money paid to the Indian agent in trust for him was within the superintendence of the President of the United States; and that the action of the Indian agent was one wholly of administrative control, within the exercise of the exclusive jurisdiction of the political department of the government and beyond the province of the judicial power to control by the writ of mandamus.

Upon hearing, the court below held that the Secretary and the Commissioner had no judicial or administrative discretion in the premises, and directed the issue of the writ of mandamus in accordance with the prayer of the petition.

HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.    279

D. C.]                    Argument of Counsel.

*Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, and *Mr. Jesse C. Adkins,* Assistant, for the appellants:

1. The Indian tribes and their members are wards of the nation, and their control, superintendence, and protection are within the jurisdiction of the government of the United States. *United States* v. *Kagama,* 118 U. S. 375; *Cherokees* v. *Georgia,* 5 Peters, 1.

2. The mere fact that by an allotment of land in severalty the Indian is declared by the act of February 8, 1887, to be a citizen does not put an end to this status of wardship or the corresponding power of superintendence and protection. *Farrell* v. *United States,* 110 Fed. 942; *State* v. *Columbia George,* 65 Pac. Rep. 604, 610; *Beck* v. *Flournoy Real Estate Company,* 65 Fed. 30; *U. S.* v. *Flournoy,* 69 Fed. 886, 895; *Eells* v. *Ross,* 64 Fed. 417; *Pilgrim* v. *Beck,* 69 Fed. Rep. 895; *U. S.* v. *Flournoy, L. S. Co.* 71 Fed. 576, 579; *United States* v. *Mullin,* 71 Fed. 682, 687; *Cherokee Nation* v. *Hitchcock,* 182 U. S. —.

3. The proceeds of the sale of timber under the regulation giving consent to such sale are a trust fund to be employed in the furtherance of the Indians' interests under the superintending authority of the United States. Why countersigned by the agent? If it had been intended that the fund, however large it might be, and however great a proportion it might bear to the whole value of the tract, should be at the absolute and uncontrolled disposal of the Indian, then this restriction in the regulation is unnecessary.

But it is not unnecessary. It is there for a purpose and in pursuance of a duty to protect the improvident, reckless, and inexperienced Indian from waste and spoliation. Its manifest purpose is that the fund, representing, as it does, so considerable a part of the newly allotted property, shall not be at the uncontrolled disposition of the Indian, a temptation to reckless extravagance and dissipation, an excuse for idleness and drunkenness. Not to have guarded against these obvious consequences would have been to make the Indian's property an obstacle to the

280 HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.

Argument of Counsel. [22 App.

very purpose for which the restricted allotment was made, namely, to bridge the perilous transition period between savagery and civilization, to accustom the Indian by gradual stages to a settled life, industry, and independence. The provisions of the regulations are in pursuance of the general power of superintendence, which we have already seen from the authorities to remain in the Federal government, notwithstanding the Indian citizenship.

4. The regulations and directions promulgated by the Secretary of the Interior and the Commissioner of Indian Affairs for the gradual payment of the fund deposited in trust for the Indian, being in contemplation of law the acts of the President in pursuance of the foregoing power and duty of guardianship, are acts done in the course of administrative duty, and not subject to judicial review and control. It would seem that the control, superintendence, and guardianship of Indians remain in the Federal government, notwithstanding the citizenship of the Indian. It would seem that, by virtue of the treaty of 1854, the President is authorized to impose such conditions upon alienation as he may see fit. The patent to Bigboy does not renounce that power and control, but expressly reserves it in and by the condition that the patentee "shall not sell, lease, or in any manner alienate," without the consent of the President. In accordance with the terms and conditions of that consent as expressed in the regulation of December 6, 1893, the proceeds have been deposited in trust. The paramount power of superintendence and protection reserved to the United States being thus lodged in the President, it must follow that, if the act complained of is pursuant to that power, it cannot be controlled by judicial process. The regulations and directions of the Secretary of the Interior and his subordinate, the Commissioner of Indian Affairs, in respect of all matters concerning the Indian relation are, in contemplation of law, the action of the President. *Wilcox* v. *Jackson,* 13 Pet. 498, 513; *Wolsey* v. *Chapman,* 101 U. S. 755, 769, 770. Being the act of the President in the performance of the duty vested in him by the treaty and statutes to guard and protect the Indian in the property, which, though allotted to

HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.     281

D. C.]                    Argument of Counsel.

him, remains subject to the administrative control of the Federal government, they are matters of administration solely cognizable by the Executive Department.

*Mr. Chester Howe, Mr. Jackson H. Ralston,* and *Mr. Frederick L. Siddons,* for the appellee:

1. The provision providing for the countersigning of the check by the agent was a proper provision, and its reason can be plainly seen. The money received by the bank was not paid to the bank by the Indian, and the bank could not, in the ordinary course of business, have the Indian's signature. It is a further fact, well known, that in Indian tribes, prior to and after the adoption of the habits of civilized life several members of a family sometimes take the same name, and two or more men of the same name might have allotments assigned and patented to them. They might each make contracts for the sale of timber, and there might be different amounts of money due upon the different contracts. The agent who is familiar with these men and their identity is required to countersign the check, thus establishing the identity of the party receiving the money, certifying to the signature as well, and protecting both buyer, seller, and the bank, avoiding confusion and tending to correct business methods. This is supported by the use of the term and by its definition. "Countersign" is "to sign what has already been signed by a superior. To authenticate by an additional signature." See volume 7, second edition, Encyclopædia of Law, page 897, and authorities. See also Century Dictionary. The word "countersign" is used in the rules and regulations and made part of the contract, with a full knowledge of its ordinary meaning, and in view of the conditions herein set forth, not only for the protection of the Indian, but for the protection of the other parties to the contract as well.

It is not alleged by the appellants that the contracting parties had any other understanding than the one presented in the petition at the time this contract was made. It is not denied that they were not both able, willing, and actually did contract with

an understanding of the terms and the meaning of the contract, as stated in the petition, and had it been the purpose to change the manner or method of payment, the same should have been included therein in plain language which could have been understood by all of the parties thereto.

2. After the making and the approval of the contract, duly authorized as it was by law, the appellants cannot read into it anything which was not included in the original agreement, which was made with their sanction and consent, and after being executed, was approved by them. The agreement having been made under the authority of the President specifically given, they are both legally and equitably estopped from denying the terms thereof; they having permitted the removal of the timber and the conversion of the property of the appellee into money.

3. The appellants admitted a violation of the terms of the contract, it being admitted that this money was deposited by the agent to his own credit, and not to the credit of the appellee, as required by the terms of the contract, although, under the pleadings in the case, it appears that said deposit has been transferred, prior to answer, to the credit of the appellee. And the appellants have recognized the qualifications of the appellee to receive payment for the subject-matter of this suit. *First:* In granting to him a patent for this contract to land under an authority which provided that the President should issue patents therefor in the following terms: "That he may at his discretion, as fast as the occupants become capable of transacting their own business, issue patents, etc.;" and a patent was actually issued under said treaty. *Second:* In recognizing the right of the appellee to sell or not to sell the standing timber, in permitting him to contract with relation thereto, and approving the same after he had sold it. That they cannot now be heard to allege that he was a citizen for the purpose of selling, and not a citizen for the purpose of receiving the proceeds of the sale.

4. It is not alleged by the appellee that by the act of February 8, 1887, the status or relation of wardship existing between Indian tribes and the government of the United States has been

altered or changed so far as the tribes in their tribal property
are concerned.   That act related to individuals and to individ-
ual rights that might be acquired thereunder, and for this rea-
son nearly all of the citations referred to in the brief of the ap-
pellant do not apply to the issues joined in this case, or the con-
ditions arising out of the subject-matter of this controversy.
Federal authority exists, and is extended over Indian reserva-
tions so long as they remain reservations.   It is not contended
that the appellee in this case has the right, or claims the right, by
his own act to terminate a trust expressly created by statute.
He could not dispose of the land included in his allotment dur-
ing the trust period without the consent of the President of the
United States.   He could not dispose of any portion of the com-
mon funds or tribal lands of the Bad River Indians.   They re-
mained subject to the disposition of the officers who represented
the government in the management of Indian affairs under the
authorities set forth by the appellants.   But, on the contrary,
he has the right to issue and dispose of just as much of his own
property as belongs to him as an individual upon which the
trust has been exhausted under consent of the President and by
authority of law.   He *is* no longer an Indian in the sense in
which the term is used in referring to tribal Indians, but hav-
ing by operation of law and his own act become a citizen of the
United States, he still retains an interest in lands and moneys
which are not the subject-matter of this controversy, and which
are under the guardianship and control of the officers of the
United States as trustees in conformity with the provisions of
law; and the rules and regulations which provide for the sale of
the standing timber were prepared with reference to both classes
of this land, and provided a distinct method of payment as to
that which had been taken in severalty, and that which remained
as common tribal property.   The position of the appellee in this
case, instead of being opposed to the reasoning of the authori-
ties cited, is directly in line therewith.   Congress had the right
to place restrictions upon the alienation of land acquired or to
be acquired by individual members of former Indian tribes, and
thereby created a trust which it is the duty of the government,

284    HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.

Opinion of the Court.                    [22 App.

through its officer, to comply with in both letter and spirit. It also had the right to provide means for the termination of trust of this character, and to place in the hands of the President the authority to terminate a trust similar to the one created in the treaty between the United States and the Chippewa Indians. When so terminated there is no longer any authority in the executive officers to withhold the payment or payments of money due to citizens of the United States, even though they were of Indian birth.

The rights of the Indian by virtue of recent statutes constituting him a citizen are explained fully and satisfactorily in *Re. Celestine,* 114 Federal Reporter, 551, wherein it is declared that an Indian born within the United States, to whom an allotment of land in severalty has been made pursuant to law, becomes, under the act of February 8, 1897 (1 Supplement Revised Statutes, 2d edition, page 536), a citizen of the United States, with all the rights, privileges, and immunities of such, among which is the right to sue in proper person, Federal or State; and, therefore, the government is relieved from the duty of representing him in suits involving his personal or domestic rights. Relying upon this decision, we may claim with absolute assurance the right of the relator in this case to claim in his own name the personal right assured to him with the consent of the government in the contract signed by him with Stearns.

Mr. Justice Morris delivered the opinion of the Court:

We are unable to see what part the fact of the citizenship of the relator performs in the present case. He might well be a citizen, with all the rights and privileges of citizens, and yet be disqualified from the exercise of absolute ownership over certain specified property. If it be conceded that among the rights of citizenship is that of freely acquiring, holding, and disposing of property, yet it does not follow that the grantor of property may not place restrictions upon its use by the grantee or person for whose benefit is is granted. It is of daily experience that in the matter of wills, marriage settlements, deeds of trust, and

other similar arrangements, property is tied up and the right of alienation and disposal of it is restricted; and yet it has never been supposed that thereby the right of citizenship of the grantee ·or beneficiary is impaired. The provision made in the present and other similar cases for those who are or have been wards of the government of the United States are analogous to ordinary trusts wherein it is sought, by restricting the right of disposition, to guard the beneficiaries against the results of their own improvidence; and we fail to find in either any impairment of the right of citizenship. If the emancipated Indian chooses to save his money, and therewith to buy land or other property, and freely to sell it again after he has purchased it, we presume that the law does not prevent him now from so doing. But when the United States, as guardian of the Indians, collectively and individually, seeks to secure any specified property to them in such manner as that they shall not improvidently squander it, we see no reason why the United States may not limit their own grant as they see proper. We see no reason why they might not have done this with white settlers on the national domain, if they had deemed it expedient to do so. The matter of citizenship is an entirely extraneous thing, and has nothing whatever to do with the case. The question is whether the United States have restricted, and how far they have restricted, the use of the property which they have themselves granted. For, of course, under our theory of the respective rights of the United States and of the Indians, the lands allotted to the latter either as tribal reservations or in severalty are the property of the United States, and the latter may restrict the use of them by the Indians and the proceeds of sale thereof to any extent to which it is feasible to go.

This case, therefore, must be disposed of under its own facts and circumstances, without reference to the citizenship of the relator. Now, with reference to these facts and circumstances, we are compelled to conclude that there is not here presented a case of plain ministerial duty which the respondents refuse to perform, and such as it is proper to enforce by the writ of mandamus. The very structure of the petition in the case implies

286     HITCHCOCK *v*. UNITED STATES ex rel. BIGBOY.

Opinion of the Court.                    [22 App.

that the action sought to be controlled is one of administrative propriety, involving judicial discretion, rather than a merely ministerial duty. If there is any plain ministerial duty to be performed, it would seem to be rather that of the local Indian agent in countersigning the relator's check, than that of the Secretary of the Interior and of the Commissioner of Indian Affairs in their general control of all matters relating to the Indians. The regulations, under which the relator entered into contract and procured the money in question to be realized, imposed the duty upon the local Indian agent of countersigning the relator's check when such money or any part thereof is sought to be withdrawn from the bank in which it is deposited. If this is a purely ministerial duty, which the Indian agent is actually required to perform when requested so to do, and which, therefore, he could be compelled by mandamus to perform, it cannot fall within the scope of the authority either of the Commissioner of Indian Affairs or of the Secretary of the Interior to interfere with it in the course of their administration of the Bureau of Indian Affairs; and no order given either by the Commissioner or by the Secretary could be a justification for refusal on the part of the local Indian agent. If, on the other hand, the action sought to be had is one of administrative character which the Secretary and the Commissioner may control, it is very plain that the relator has no case; for the action can no longer be regarded as purely ministerial. The relator's proceeding would seem to contemplate that the whole administrative machinery of the Bureau of Indian Affairs can be set in motion and controlled by the courts for the performance of a merely ministerial duty on the part of a subordinate local agent.

But if we take the Bureau of Indian Affairs in its entirety, and regard the act to be performed as that of the Secretary or Commissioner, by the local Indian agent as their clerk or employee, yet we are unable to see that the act is of that purely ministerial character which can be enforced by the writ of mandamus. It is not controverted that under the treaty of 1854 the President had power to place restrictions upon the alienation of the lands alloted in severalty. He exercised that power

by providing that the Indian owners should not sell without his consent. It seems, also, not to be controverted that the restriction extended to the sale of the timber on the land as well as to the land itself; and this restriction was sought to some extent to be carried over to the proceeds of the sale of the timber, when it was provided that these proceeds could not be disposed of by the Indian owner without the concurrent action of the Indian agent.

Whether in fact and in law the restriction upon the right of alienation, when once removed by the authority given to the Indian owner to enter into contract in regard to the timber, was intended to extend to the proceeds of sale, and did in fact under the terms of the regulations extend to such proceeds, may be an open question. It is the contention of the respondents that it did so extend; it is the contention of the relator that it did not. Certainly there was more or less of restriction in the provision that the proceeds of the sale could not be withdrawn from the bank by the action of the relator alone, without having his check countersigned by the local Indian agent. This provision means something. It is claimed on behalf of the relator that its purpose is merely to identify him at the bank. On the part of the respondents it is claimed that the intention was, in harmony with all the preceding action, to place a check upon the notorious improvidence of the Indian. In the absence of all testimony how are we to judge of this? Are we to disregard the interpretation placed by the department upon its own regulation, or rather the regulation made by the President through the department? In any event, there is serious controversy as to the meaning of the regulation; and for that reason alone, if for no other, the act sought to be performed is taken out of the category of plain ministerial actions subject to be enforced by the writ of mandamus. Even if we were of opinion that the construction claimed by the relator is the true construction of the regulation and of the contract made in pursuance of it, the courts should hesitate before they required an executive department of the government to abandon its own construction and its administrative action thereunder. It was within the power of

288    HITCHCOCK *v.* UNITED STATES ex rel. BIGBOY.

Opinion of the Court.                    [22 App.

that executive department, or of the President, as its final chief and head, and as chief and head of all the executive departments, to make the regulation express in specific terms that which the department now claims that it was intended to mean. And if the President could do that, as beyond question he could, why should the courts repudiate the construction which the Secretary and Commissioner, acting under his authority, place upon the regulation and the contract?

If injustice and hardship result from this construction, as it has been ably argued that they would result, and that the money of the Indian would be frittered away by being paid to him merely in driblets, with which he could accomplish nothing substantial, that is an argument to be addressed to those who have the administration of Indian affairs, and who must be presumed to be open, as much as the courts, and indeed more so, to such argument, and to solicitude for the general welfare of the Indian; and there is always the right of appeal to the President, and ultimately also the right of appeal to the Congress of the United States. But the courts, by the writ of mandamus, cannot remedy all cases of hardship and injustice. Their jurisdiction in that regard is exceedingly limited and well defined, and it is wholly unnecessary to recur to the repeated enunciations of our tribunal of last resort on the subject.

We are of opinion, therefore, that by the petition and the return in this case there is not shown a plain ministerial duty to be performed by the respondents and which they are required by law to perform for the relator; that the matter of citizenship of the relator has nothing whatever to do with the case; and that the result of the writ of mandamus here would be to control the administrative action of the Bureau of Indian Affairs and the Department of the Interior, which it is not competent for the courts to do.

We must, therefore, reverse the order appealed from, with costs; and remand the cause to the Supreme Court of the District of Columbia, with directions to discharge the rule to show cause and to dismiss the petition.

And it is so ordered.                    *Reversed.*